UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ALBERT THOMAS THORNE, III, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| *vs.* | ) | No. 1:20-cv-01108-JMS-MJD |
| | ) | |
| LANCE PICKRELL, CESAR MUNOZ, ANDREW | ) | |
| SNYDER, FRANKFORT CITY POLICE | ) | |
| DEPARTMENT, and CITY OF FRANKFORT, | ) | |
| | ) | |
| *Defendants*. | ) | |

## **ORDER**

Just after midnight on August 30, 2018, *pro se* Plaintiff Albert Thorne, who was well known to the Frankfort Police Department (the "FPD"), was walking with a female companion on a street in downtown Frankfort, Indiana when FPD Officer Lance Pickrell spotted him. Officer Pickrell ran Mr. Thorne's name through a database, and learned that a warrant had been issued for Mr. Thorne's arrest. Officer Pickrell pulled up beside Mr. Thorne in his marked police cruiser and asked Mr. Thorne to speak with him. Instead, Mr. Thorne ran away from Officer Pickrell, which prompted Officer Pickrell to exit his police cruiser and give chase. FPD Lieutenant Cesar Munoz and FPD Officer Andrew Snyder arrived just as a struggle ensued between Officer Pickrell and Mr. Thorne, and they joined in to help subdue Mr. Thorne. After being pepper sprayed and restrained by the officers, Mr. Thorne was handcuffed and ultimately arrested and brought to jail. In April 2020, Mr. Thorne initiated this lawsuit against Officer Pickrell, Lieutenant Munoz, Officer Snyder, the FPD, and the City of Frankfort (the "City"), alleging various constitutional and state law claims. Defendants have now filed a Motion for Summary Judgment, [Filing No. 34], which is ripe for the Court's consideration.

# I.
## STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." S.D. Ind. L.R. 56-1(e). And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." *Id.* The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h). Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion. Fed. R. Civ. P. 56(e)(2).

2

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A twist on the normal standard of review is at play here: When the record evidence includes videos of the relevant events, the Court should not adopt the non-movant's version of the facts when that version contradicts what is depicted on the videos. *Scott v. Harris*, 550 U.S. 372, 378-80 (2007) (where plaintiff's account of high-speed chase contradicted dashcam video of chase, and there were no allegations that dashcam video was "doctored or altered in any way, nor any contention that what it depict[ed] differ[ed] from what actually happened," lower court "should have viewed the facts in the light depicted by the videotape"). Accordingly, where the body camera footage from Officer Pickrell, Lieutenant Munoz, and Officer Snyder depicts certain events, the Court relies primarily on that footage.[1]

---

[1] Defendants filed CDs containing the footage from the body cameras worn by Officer Pickrell, Lieutenant Munoz, and Officer Snyder during the August 30, 2018 incident at issue in this case. [Filing No. 34-2; Filing No. 34-6; Filing No. 34-9.] The Court cites to the bodycam footage (with the relevant time on each bodycam video) as follows: (1) Pickrell Bodycam (body camera video from Officer Pickrell); (2) Munoz Bodycam 1 (body camera video from Lieutenant Munoz at the scene); (3) Munoz Bodycam 2 (body camera video from Lieutenant Munoz at the police station); (4) Snyder Bodycam 1 (body camera video from Officer Snyder at the scene); and (5) Snyder Bodycam 2 (body camera video from Officer Snyder at the emergency room).

## II.
### STATEMENT OF FACTS

The following factual background is set forth pursuant to the standard discussed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A.    The FPD's Prior Knowledge of Mr. Thorne

Before August 2018, Mr. Thorne was well known to FPD officers from prior encounters. [Filing No. 34-1 at 1; Filing No. 34-4 at 2.] Specifically, FPD officers had previously arrested Mr. Thorne on active arrest warrants in 2010, twice in 2011, 2014, and twice in 2016. [Filing No. 34-5 at 3-8.] Additionally, Mr. Thorne was arrested for resisting law enforcement in 2008, 2010, 2014, and 2016. [Filing No. 34-5 at 3-8.] Between 2008 and 2017, Mr. Thorne was convicted of multiple felonies in Clinton County, the county in which Frankfort lies, including battery, resisting law enforcement, and drug offenses. [Filing No. 34-12.]

### B.    The August 30, 2018 Encounter

#### 1.    *Officer Pickrell Observes Mr. Thorne Walking and Initiates a Stop*

On August 30, 2018, Officer Pickrell was conducting a routine patrol in his marked police cruiser. [Filing No. 34-1 at 2.] At approximately 12:48 a.m., he observed Mr. Thorne and a female companion, Jennifer Eason, walking near the intersection of Washington Avenue and Main Street in Frankfort. [Filing No. 34-1 at 2.] Officer Pickrell recognized Mr. Thorne and Ms. Eason from previous police encounters, and also noticed that Mr. Thorne was carrying a large, black backpack. [Filing No. 34-1 at 2.]

4

Officer Pickrell conducted a check for the existence of outstanding warrants on Mr. Thorne and Ms. Eason through the National Crime Information Center ("NCIC") and the Indiana Data and Communications Systems ("IDACS") databases. [Filing No. 34-1 at 2.] The NCIC database reflected that Mr. Thorne had an outstanding warrant for his arrest. [Filing No. 34-1 at 2.] Officer Pickrell confirmed that Mr. Thorne's name and date of birth matched the name and date of birth on the warrant, and he decided to conduct an investigatory stop confirm the warrant and. [Filing No. 34-1 at 2.] Officer Pickrell then radioed his dispatcher that he would be speaking with Mr. Thorne, and asked the dispatcher to confirm the warrant with the issuing agency. [Filing No. 34-1 at 3.]

2.   *Mr. Thorne Flees From Officer Pickrell*

Officer Pickrell, who was in full uniform, exited his police cruiser, called out to Mr. Thorne, and told Mr. Thorne that he needed to speak with him. [Filing No. 34-1 at 3.] Mr. Thorne was not sure who was calling to him because it was dark and Officer Pickrell did not immediately identify himself. [Filing No. 43-1 at 2.] Mr. Thorne kept walking away, and Officer Pickrell then asked him to stop. [Filing No. 34-1 at 3.] Officer Pickrell again stated that he needed to speak with him. [Filing No. 34-1 at 3.][2] Ms. Eason stopped, but despite Officer Pickrell asking him to stop several times, Mr. Thorne continued to walk away. [Filing No. 34-1 at 3.] Officer Pickrell asked Mr. Thorne to stop several times, but he kept walking away while yelling back at Officer Pickrell and then began to run. [Filing No. 34-1 at 3; Filing No. 43-1 at 2.]

Officer Pickrell believed that Mr. Thorne was fleeing a valid arrest warrant, and pursued Mr. Thorne on foot. [Filing No. 34-1 at 3.] Officer Pickrell activated his body camera, began

---

[2] Officer Pickrell claims that he told Mr. Thorne there was a warrant out for his arrest, [Filing No. 34-1 at 3], but Mr. Thorne states in his Affidavit that Officer Pickrell did not mention a warrant, [Filing No. 43-1 at 2].

chasing Mr. Thorne, and yelled, "you better stop, Albert." [Pickrell Bodycam at 00:07.] Officer Pickrell informed dispatch that Mr. Thorne was running "north on Main." [Pickrell Bodycam at 00:11-00:12.] As he began to catch up to Mr. Thorne, Officer Pickrell drew his department-issued taser, believing he might need to use it. [Filing No. 34-1 at 3.] When Mr. Thorne kept running, Officer Pickrell yelled, "stop, I'm going to tase you." [Pickrell Bodycam at 00:12-00:17.] Officer Pickrell yelled, "stop" another time, and Mr. Thorne yelled, "what did I do, man?" [Pickrell Bodycam at 00:18-00:19.] Meanwhile, Officer Snyder and FPD Officer Mitchell Cottrell, along with Lieutenant Munoz, began responding to the area of the chase to provide assistance. [Filing No. 34-4 at 2; Filing No. 34-8 at 2.]

### 3. *Officer Pickrell Catches up to Mr. Thorne and a Struggle Ensues*

Just as Officer Pickrell was catching up, Mr. Thorne stopped, turned toward Officer Pickrell, and squared his body to Officer Pickrell with clenched fists. [Filing No. 34-1 at 3.] Officer Pickrell was running fast, and his momentum carried him into Mr. Thorne causing them to collide. [Filing No. 34-1 at 3.] After colliding, Officer Pickrell took Mr. Thorne to the ground and attempted to gain control of him so that he could arrest him.[3] [Filing No. 34-1 at 3.] As they went to the ground, Officer Pickrell lost control of his taser. Officer Pickrell "struck [Mr. Thorne] with knee blows to [his] body," [Filing No. 43-1 at 2], and was able to get on top of Mr. Thorne, with Mr. Thorne's face toward the ground, [Filing No. 34-1 at 3]. Officer Pickrell still was not in control of Mr. Thorne, and Mr. Thorne had his hands tucked under him, near his waist. [Filing No. 34-1 at 3.] Officer Pickrell repeatedly told Mr. Thorne to stop resisting, and to show his hands, which Mr. Thorne refused to do. [Filing No. 34-1 at 3.] Officer Pickrell saw Mr. Thorne toss

---

[3] Officer Pickrell states in his Affidavit that Mr. Thorne momentarily placed him in a headlock. [Filing No. 34-1 at 3.] Mr. Thorne denies placing Officer Pickrell in a headlock, but acknowledges that he "was trying to defend [himself]." [Filing No. 43-1 at 2.]

Officer Pickrell's taser out from under Mr. Thorne, to the side and away from them. [Filing No. 34-1 at 3.] Officer Pickrell used distraction techniques in order to try to have Mr. Thorne remove his hands from under his chest area. [Filing No. 34-1 at 3.]

### 4. Lieutenant Munoz and Officer Snyder Arrive on the Scene

As Officer Pickrell and Mr. Thorne were struggling, Lieutenant Munoz and Officer Snyder arrived on the scene. [Filing No. 34-4 at 2; Filing No. 34-8 at 2.] Lieutenant Munoz observed that Officer Pickrell and Mr. Thorne were engaged in a physical struggle, and that Mr. Thorne was actively resisting. [Filing No. 34-4 at 2.] Lieutenant Munoz and Officer Snyder observed further that Officer Pickrell appeared to be trying to gain control of Mr. Thorne's hands, but was not having any success. [Filing No. 34-4 at 2; Filing No. 34-8 at 2.] Officer Snyder and Lieutenant Munoz observed that Mr. Thorne's hands were tucked underneath him, and Mr. Thorne refused several commands to release his hands. [Filing No. 34-4 at 3; Filing No. 34-8 at 2.] Because Mr. Thorne's hands were tucked under his body near his waist, Lieutenant Munoz feared that he was concealing a weapon and would use it to harm Officer Pickrell, Lieutenant Munoz, or other officers. [Filing No. 34-4 at 3.] Lieutenant Munoz ordered Mr. Thorne several times to stop resisting and to put his hands behind his back, but Mr. Thorne refused. [Filing No. 34-4 at 3; Munoz Bodycam 1 at 00:20-00:26.]

Lieutenant Munoz deployed his OC spray[4] in an attempt to get Mr. Thorne to comply with the commands to show his hands, for the safety of both Officer Pickrell and Mr. Thorne and because it posed far less risk of injury than other types of force. [Filing No. 34-4 at 3; Munoz Bodycam 1 at 00:35-00:45.] The OC spray was not immediately effective, Mr. Thorne continued

---

[4] OC spray is Oleoresin Capsicum spray, more commonly known as pepper spray. http://www.sciencedirect.com/topics/neuroscience/capsicum-oleorasein (last accessed October 14, 2021).

to resist, and it looked as if he was reaching for something in his waist band.  [Filing No. 34-4 at 3.]  At that point, Lieutenant Munoz delivered two closed fist strikes to Mr. Thorne's torso.  [Filing No. 34-4 at 3.]  In all, Officer Pickrell, Lieutenant Munoz, and Officer Snyder told Mr. Thorne to give the officers his hands or to put his hands behind his back at least fourteen times during the struggle.  [Pickrell Bodycam at 00:36-01:22.]

        *5.*       *Mr. Thorne Is Handcuffed*

Lieutenant Munoz and Officer Snyder were ultimately able to secure Mr. Thorne's hands and place him into handcuffs.  [Filing No. 34-4 at 3; Filing No. 34-8 at 2.]  During the struggle and the handcuffing process, Mr. Thorne repeatedly complained that he was in pain and that he could not breathe.  [Pickrell Bodycam at 00:36-01:40.]  After Mr. Thorne was handcuffed, he asked Officer Pickrell, "what [did] you f***ing chase me for, dude?  What the f*** did I do?" [Pickrell Bodycam at 01:41-01:45.]  Officer Pickrell responded, "because you took off on me." [Pickrell Bodycam at 01:46-01:47.]  Mr. Thorne responded, "you f***ing freaked me out," and Officer Pickrell responded, "whatever, dude."  [Pickrell Bodycam at 01:46-01:48.]

Officer Pickrell told other officers at the scene that Mr. Thorne threw his taser and that it "got underneath [Mr. Thorne]."  [Pickrell Bodycam at 01:54.]  Mr. Thorne acknowledges that he threw the taser, but only to move it out of his way, and that he did not "launch it."  [Pickrell Bodycam at 01:58-02:04.]  Mr. Thorne asked the officers on the scene, "why you guys f***in' with me?"  [Pickrell Bodycam at 02:16.]  He continued to express that he was in pain, and to ask why the officers are "f***in' with him,"  why he was chased, and what he did.  [Pickrell Bodycam at 03:10-03:22.]  Twice, Mr. Thorne referred to Officer Pickrell as "Lance" when asking what he had done and why the officers were "f***in' with him."  [Snyder Bodycam 1 at 02:12; Snyder

Bodycam 1 at 02:39.]  Mr. Thorne continued to complain that he was in pain, and Officer Snyder loosened his handcuffs.  [Snyder Bodycam 1 at 02:07-02:42.]

Officer Pickrell informed Lieutenant Munoz that there was an outstanding warrant on Mr. Thorne.  [Munoz Bodycam 1 at 03:40-03:48.]  Lieutenant Munoz then checked the database and also saw the outstanding warrant, and then stated to Mr. Thorne, "we have a warrant for you." [Munoz Bodycam 1 at 03:50-04:29.]  He explained to Mr. Thorne, "he [Officer Pickrell] ran you and you ran, you have a warrant, that's what it is."  [Munoz Bodycam 1 at 04:32-04:35.]

Officer Pickrell told Mr. Thorne, "Albert, you called me by name and took off running. You called me by name and took off running."  [Pickrell Bodycam at 08:34-08:41.]  Mr. Thorne denied doing so, and Officer Pickrell said, "yes, you did.  My camera's got it all."  [Pickrell Bodycam at 08:42-08:44.]  Mr. Thorne was placed under arrest.  [Filing No. 34-8 at 3.]

6.    *Officer Snyder Searches Mr. Thorne and His Backpack*

Officer Snyder attempted to take a black backpack off of Mr. Thorne's back, and Mr. Thorne told him that he could not see, and there was no reason to search him or his backpack. [Pickrell Bodycam at 05:03-05:18.]  Mr. Thorne began squirming in an effort to keep Officer Snyder and Lieutenant Munoz from taking the backpack off of his back.  [Munoz Bodycam 1 at 05:05-05:17; Snyder Bodycam 1 at 04:14-04:28.]  Officer Snyder then searched Mr. Thorne and the black backpack that Mr. Thorne was wearing.  [Filing No. 34-8 at 2.]  During the search of the backpack, Officer Snyder found a syringe and a powder substance that field tested positive as methamphetamine.  [Filing No. 34-8 at 2-3; Munoz Bodycam 1 at 13:50-14:04.]  Also inside Mr. Thorne's backpack, Officer Snyder found a scale, money, ledgers, bags, and a half-smoked marijuana cigarette.  [Filing No. 34-8 at 3; Filing No. 34-10.]  Lieutenant Munoz told Mr. Thorne, "So I see you are on probation," but Mr. Thorne denied that was the case and asked if that was

why there was a warrant on him.  [Munoz Bodycam 1 at 16:16-16:26.]  Lieutenant Munoz said

that was not why he had a warrant.  [Munoz Bodycam 1 at 16:26-16:28.]  Mr. Thorne asked what

the warrant was for, and Lieutenant Munoz told Mr. Thorne that he would let him know.  [Munoz

Bodycam 1 at 16:29-16:32.]

7.    *Paramedics Are Called to the Scene*

Officer Pickrell was injured during the struggle with Mr. Thorne and sustained cuts and

bruises to his face.  [Filing No. 34-1 at 3.]  After Mr. Thorne was handcuffed, the officers on scene

called an ambulance to render assistance to Mr. Thorne due to the effects of the OC spray on Mr.

Thorne's eyes.  [Filing No. 34-4 at 3; Munoz Bodycam 1 at 01:56-01:58.]  Mr. Thorne was given

water to rinse his eyes by FPD officers and the responding paramedics.  [Filing No. 34-4 at 3.]

Mr. Thorne told the paramedics that he "took off running" because he "got scared, man." [Pickrell

Bodycam at 10:48-10:54.][5]  Mr. Thorne refused to be transported to the emergency room for

evaluation.  [Filing No. 34-4 at 3; Pickrell Bodycam at 09:04-09:06; Pickrell Bodycam at 15:45-

15:52.]

8.    *Mr. Thorne is Transported to the Clinton County Jail, Then to the*
      *Emergency Room, and Then Back to the Clinton County Jail*

Right before Mr. Thorne was loaded into a police cruiser to be transported to the Clinton

County Jail, Lieutenant Munoz explained to him that Officer Pickrell had discovered Mr. Thorne

had an outstanding warrant, and that is why he had initiated the stop.  [Snyder Bodycam 1 at 21:17-

21:32.]  Mr. Thorne told Lieutenant Munoz that the warrant was non-extraditable and "not enough

to stop" him, and Lieutenant Munoz told Mr. Thorne that the warrant was "enough" to stop him.

---

[5] While Mr. Thorne was being treated by paramedics, Officer Pickrell and Officer Snyder
recounted that Mr. Thorne would not show his hands during the struggle, Officer Snyder
commented that he thought Mr. Thorne was hiding something in his waistband, and Officer
Pickrell stated, "I took his knife off of him."  [Pickrell Bodycam at 11:47-11:49.]

10

[Snyder Bodycam 1 at 21:33-21:40.]  Mr. Thorne maintained that Officer Pickrell did not have probable cause to stop him, and Lieutenant Munoz told him he could argue that in court.  [Snyder Bodycam 1 at 22:08-22:15.]

Officer Snyder and Officer Cottrell transported Mr. Thorne to the Clinton County Jail, and he was given additional water at the jail to flush his eyes.  [Filing No. 34-8 at 3.]  Mr. Thorne complained that his knees and foot hurt and that he hurt "all over," but stated that he did not want to go to the emergency room because he did not want to pay for treatment.  [Munoz Bodycam 2 at 00:24-01:28.]  Lieutenant Munoz took multiple pictures of Mr. Thorne's injuries.  [Munoz Bodycam 2 at 01:50-02:16.]

Mr. Thorne repeatedly complained that he was hurt, in pain, and his eyes were burning, so Lieutenant Munoz told him they were going to transport him to the emergency room.  [Munoz Bodycam 2 at 03:30.]  Mr. Thorne repeatedly said he was not going to the emergency room and refused to walk, but two officers guided him back into a police cruiser.  [Munoz Bodycam 2 at 03:20-05:25.]  Officer Snyder and Officer Cottrell then transported Mr. Thorne to IU Frankfort Hospital's emergency room, even though Mr. Thorne did not want to go, so that he could be medically evaluated before being admitted to the Clinton County Jail.  [Filing No. 34-8 at 3.] Although Mr. Thorne had sustained several abrasions during the scuffle leading to his arrest, he refused treatment at the emergency room, and asked to be released.  [Filing No. 34-8 at 3.]  The emergency room physician found some abrasions on Mr. Thorne's knees and noted a small, non-bleeding laceration on the bottom of his foot which he received when his shoe came off while he was running.  [Filing No. 34-13 at 5-6.]  Mr. Thorne denied any changes to his vision and told the emergency room physician that he did not want to be examined and refused any treatment for his abrasions.  [Filing No. 34-13 at 5-6.]  He also told the emergency room physician that he did not

want his foot to be x-rayed, despite complaining that it was painful. [Snyder Bodycam 2 at 02:40-02:44.]  Mr. Thorne complained repeatedly that his face and eyes hurt from the OC spray, and Officer Snyder and Officer Cottrell explained to the emergency room doctor that they had already rinsed Mr. Thorne's eyes with a gallon of water and that the paramedics had also rinsed his eyes. [Snyder Bodycam 2 at 03:00-03:10.]

While in the emergency room, Mr. Thorne was breathing heavily and shivering.  [Snyder Bodycam 2 at 04:30-05:06.]  Officer Cottrell covered Mr. Thorne with a hospital gown after he requested a blanket.  [Snyder Bodycam 2 at 04:55-04:57.]  Mr. Thorne again declined an x-ray on his foot, and also declined antibacterial cream for the abrasions on his knees.  [Snyder Bodycam 2 at 07:18-07:27.]  The emergency room physician gave Mr. Thorne a prescription for an antibiotic cream in case Mr. Thorne changed his mind about wanting to treat the flap laceration on the bottom of his foot.  [Filing No. 34-13 at 6.]  After he was cleared by the emergency room physician, Officer Snyder and Officer Cottrell transported Mr. Thorne back to the Clinton County Jail.  [Filing No. 34-8 at 3.]

9.    *Officer Pickrell, Lieutenant Munoz, and Officer Snyder Learn That Mr. Thorne's Warrant Was Non-Extraditable*

Sometime after Mr. Thorne was arrested, Officer Pickrell learned from dispatch that the NCIC warrant which led to the pursuit of Mr. Thorne was out of New Mexico, and was non-extraditable.  [Filing No. 34-1 at 4.]  Lieutenant Munoz learned that the warrant was non-extraditable after Mr. Thorne's arrest and sometime after he sprayed Mr. Thorne with OC spray.  [Filing No. 34-4 at 3.]  Officer Snyder learned of the non-extraditable nature of the warrant after he searched Mr. Thorne's backpack.  [Filing No. 34-8 at 3.]

C.        **The Criminal Proceeding Related to the August 30, 2018 Incident**

As a result of the August 30, 2018 incident, Mr. Thorne was charged with dealing in methamphetamine, possession of methamphetamine, battery against a public safety official, unlawful possession of a syringe, and resisting law enforcement.  [Filing No. 34-5 at 10.]  Mr. Thorne moved to suppress the evidence obtained during the August 30, 2018 search because the arrest warrant that led to his initial stop was non-extraditable.  [*See* Filing No. 43-2 at 37-38.]  The Clinton Superior Court denied Mr. Thorne's Motion to Suppress, but the Indiana Court of Appeals reversed that decision and the evidence obtained during the search was ultimately suppressed. [Filing No. 43-2 at 39-46 (*Thorne v. State of Indiana*, Case No. 19A-CR-320 (Ind. Ct. App. Aug. 28, 2019)).]  The prosecutor then moved to dismiss the charges against Mr. Thorne and the matter was closed.  [Filing No. 34-14.]

D.        **This Lawsuit**

Mr. Thorne initiated this lawsuit against Officer Pickrell, Lieutenant Munoz, Officer Snyder, the FPD, and the City on April 10, 2020.  [Filing No. 1.]  His twenty-two page Complaint is rambling and repetitive, and it is oftentimes not clear against whom he is asserting each claim. In any event, the Court discerns the following claims: (1)  unlawful stop and arrest in violation of the Fourth Amendment[6] under 42 U.S.C. § 1983 against Officer Pickrell, Lieutenant Munoz, and

---

[6] Mr. Thorne also refers to the Fifth and Fourteenth Amendments in setting forth many of his claims.  The Court treats Mr. Thorne's unlawful stop and arrest, excessive force, unlawful search, and malicious prosecution claims as brought under the Fourth Amendment.   The Fifth Amendment's Due Process clause applies to actions by the federal government, not state government entities and individuals like Defendants are here.  *Dusenberry v. United States*, 534 U.S. 161, 167 (2002).  Additionally, the Fourteenth Amendment's due process clause is the vehicle by which the Fourth Amendment is applicable to the states, and is not the substantive amendment under which Mr. Thorne's unlawful stop and arrest, excessive force, unlawful search, and malicious prosecution claims are properly brought.  *Torres v. Madrid*, 141 S.Ct. 989, 996-97 (2021).

Officer Snyder; (2) unlawful use of excessive force in violation of the Fourth Amendment under § 1983 against Officer Pickrell, Lieutenant Munoz, and Officer Snyder; (3) unlawful search in violation of the Fourth Amendment under § 1983 against Officer Pickrell, Lieutenant Munoz, and Officer Snyder; (4) malicious prosecution[7] in violation of the Fourth Amendment under § 1983 against Officer Pickrell, Lieutenant Munoz, and Officer Snyder; (5) respondeat superior liability under § 1983 for all of the above acts against the FPD and the City; and (6) various state law claims including assault and battery, false arrest, illegal search, false imprisonment, invasion of privacy, and negligent and intentional infliction of emotional distress against Officer Pickrell, Lieutenant Munoz, and Officer Snyder.  [*See* Filing No. 1.]  Defendants have moved for summary judgment on all of Mr. Thorne's claims.  [Filing No. 34.][8]

### III.
#### DISCUSSION

**A.**   **Federal Claims Against Officer Pickrell, Lieutenant Munoz, and Officer Snyder**

*1.     Unlawful Stop and Arrest Claims*

In support of their Motion for Summary Judgment, Defendants argue that Mr. Thorne's unlawful arrest claims fails because there was probable cause to arrest him.  [Filing No. 35 at 9.] Defendants assert that Mr. Thorne's successful motion to suppress evidence in his underlying criminal trial has no preclusive effect on the probable cause issue in this case, and that the existence

---

[7] As discussed below, Mr. Thorne's malicious prosecution claims are more properly characterized as wrongful pretrial detention claims brought under the Fourth Amendment.

[8] Defendants submitted a report from Brian Miller, who has been a law enforcement officer for thirty years and opines that Defendants did not violate Mr. Thorne's constitutional rights and he "did not see any viable claim against the [FPD] in this arrest incident of [Mr.] Thorne."  [Filing No. 34-15.]  The Court does not rely upon Mr. Smith's report in ruling on Defendants' Motion for Summary Judgment.

of the warrant created probable cause for Officer Pickrell to arrest Mr. Thorne.  [Filing No. 35 at 9-11.]  They argue further that even if the warrant did not create probable cause for Mr. Thorne's arrest, Officer Pickrell had reasonable suspicion to conduct an investigatory stop because Officer Pickrell had discovered the existence of the warrant, knew Mr. Thorne was a repeat offender and had multiple previous encounters with FPD officers, knew that Mr. Thorne had previously been picked up on outstanding warrants, and observed Mr. Thorne walking with a known criminal associate (Ms. Eason).  [Filing No. 35 at 12.]  Defendants contend that no seizure occurred during Officer Pickrell's initial encounter with Mr. Thorne because Mr. Thorne fled, and that the act of fleeing and refusing to comply with Officer Pickrell's commands created additional probable cause to arrest him.  [Filing No. 35 at 13-14.]  Defendants assert that Lieutenant Munoz and Officer Snyder have immunity on the false arrest claims because they reasonably relied on radio reports that Mr. Thorne was fleeing from a valid outstanding warrant, and that all of the officers are entitled to qualified immunity because their actions did not violate clearly established law.  [Filing No. 35 at 15-18.]

In his response, Mr. Thorne argues that there was no probable cause or arguable probable cause to arrest him.  [Filing No. 44 at 5.]  He contends that his act of fleeing Officer Pickrell and ignoring his commands did not create probable cause because the law "requires that an officer's order to stop be based on probable cause or reasonable suspicion that criminal activity is afoot." [Filing No. 44 at 5.]  He asserts that "[t]o hold that a citizen may be criminally prosecuted for fleeing after being ordered to stop by a law enforcement officer lacking reasonable suspicion or probable cause to command such an involuntary detention would undermine longstanding search and seizure[] precedent that establishes the principle that an individual has a right to ignore police and go about their business."  [Filing No. 44 at 6.]  Mr. Thorne argues that Officer Pickrell should

have confirmed the nature of the warrant before stopping and arresting him, and that Officer Pickrell did not identify himself or use emergency lights on his police cruiser when he attempted to detain Mr. Thorne. [Filing No. 44 at 9-10.] He asserts that Officer Pickrell did not have reasonable suspicion to conduct an investigatory stop because Officer Pickrell had no reason to believe that Mr. Thorne was engaged in criminal activity. [Filing No. 44 at 12.] Mr. Thorne argues that even if no seizure occurred initially, there was a seizure when Mr. Thorne stopped fleeing after being threatened with Officer Pickrell's taser. [Filing No. 44 at 14.] He contends that Lieutenant Munoz and Officer Snyder are not entitled to immunity because Mr. Thorne repeatedly stated at the scene that he had done nothing wrong and that he did not give consent to be searched. [Filing No. 44 at 18.] Finally, Mr. Thorne argues that Officer Pickrell, Lieutenant Munoz, and Officer Snyder are not entitled to qualified immunity because they lacked probable cause, lacked reasonable suspicion, and lacked arguable probable cause, so the arrest violated clearly established law. [Filing No. 44 at 19.]

In their reply, Defendants argue that the Indiana Court of Appeals decision on Mr. Thorne's motion to suppress has no preclusive effect in this case. [Filing No. 45 at 2-3.] They assert that the warrant – even though it was ultimately found to be non-extraditable – established probable cause for Mr. Thorne's arrest. [Filing No. 45 at 3-4.] As for Mr. Thorne's argument that he initially fled because he did not know that Officer Pickrell was a police officer, Defendants point to the body camera footage showing that Officer Pickrell repeatedly told Mr. Thorne to stop, that Mr. Thorne yelled to Officer Pickrell, "you have no reason to stop me," and that Officer Pickrell was dressed in full uniform. [Filing No. 45 at 4-5.] Defendants cite to caselaw standing for the proposition that an individual has no right to flee from law enforcement, even if the initial stop is unlawful. [Filing No. 45 at 5.] Defendants also argue that it was reasonable for Lieutenant Munoz

and Officer Snyder to rely on the information they heard over the dispatch radio regarding the warrant and Mr. Thorne fleeing, and that Mr. Thorne did not have a clearly established right to flee from the scene.  [Filing No. 45 at 6-8.]

Mr. Thorne brings his false arrest claims under 42 U.S.C. § 1983, which requires him to demonstrate: "(1) that he was deprived of a right secured by the Constitution or laws of the United States, and (2) that the deprivation was visited upon [him] by a person or persons acting under color of state law." *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007) (quotation and citation omitted)).  The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. CONST. amend. IV.  However, it does not prevent all encounters between the police and citizens.  The Fourth Amendment "comes into play when a police officer uses physical force or a show of authority to restrain the liberty of a citizen." *United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000).  To make an arrest, an officer needs probable cause to believe that a person has committed or is committing a crime. *Id.*

In evaluating the constitutionality of law enforcement's conduct, the Court must "carve up the incident into segments and judge each on its own terms to see if the officer[s] w[ere] reasonable at each stage." *Deering v. Reich*, 183 F.3d 645, 652 (7th Cir. 1999).  Accordingly, the Court examines in turn each segment of the actions of Officer Pickrell, Lieutenant Munoz, and Officer Snyder toward Mr. Thorne on the evening of August 30, 2018.

      a.     <u>Whether Officer Pickrell, Lieutenant Munoz, and Officer Snyder Violated Mr. Thorne's Fourth Amendment Rights By Pursuing and Arresting Him</u>

**i.    Officer Pickrell's Initial Stop of Mr. Thorne**

The first discrete act taken by one of the Defendants was Officer Pickrell's initial stop – or attempted stop – of Mr. Thorne.  Mr. Thorne argues that the stop was unjustified, but Defendants

argue that the existence of the warrant gave Officer Pickrell the requisite reasonable suspicion to initiate the stop.

Short of arrests, officers are also allowed to make "*Terry* stops," which are "investigatory stops limited in scope and executed through the least restrictive means reasonable." *Swift*, 220 F.3d at 506 (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). Because *Terry* stops are made without warrants or probable cause, they are subject to limits. *United States v. Lopez*, 907 F.3d 472, 478 (7th Cir. 2018). Officers may carry out a *Terry* stop only when they "have a reasonable suspicion, grounded in specific and articulable facts," that an individual has committed a felony or is about to commit a crime. *United States v. Hensley*, 469 U.S. 221, 229 (1985). Reasonable suspicion is "something less than probable cause and more than a hunch." *Swift*, 220 F.3d at 506. To find that reasonable suspicion existed to justify a stop, courts "must examine the totality of the circumstances in the situation at hand, in light of the individual officers' own training and experience, and should uphold the stop if it finds that 'the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing.'" *United States v. Williams*, 731 F.3d 678, 683-84 (7th Cir. 2013) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). Determinations of probable cause and reasonable suspicion normally are mixed questions of fact and law, but when the facts are undisputed, the ultimate resolution of whether probable cause or reasonable suspicion existed becomes a question of law. *United States v. Carlisle*, 614 F.3d 750, 754 (7th Cir. 2010).

Officer Pickrell initiated Mr. Thorne's stop because he had determined that there was an outstanding warrant for Mr. Thorne's arrest, and because Mr. Thorne was well known to Officer Pickrell through previous encounters. Mr. Thorne relies on the fact that the warrant was ultimately found to be non-extraditable, but he has not presented any evidence that Officer Pickrell knew that

fact before he initiated the stop.  To the contrary, the bodycam video from Officer Pickrell shows that Officer Pickrell believed the warrant to be valid.  [*See, e.g.*, Munoz Bodycam1 at 03:40-03:46 (Officer Pickrell telling Lieutenant Munoz at the scene that there is an outstanding warrant for Mr. Thorne's arrest).]

Additionally, Mr. Thorne's reliance on the Indiana Court of Appeals' determination that Officer Pickrell did not have reasonable suspicion to stop him and, consequently, that the search of his backpack was illegal, is misplaced.  The Indiana Court of Appeals found that it was unreasonable for Office Pickrell not to confirm that the warrant was extraditable, that there was no ongoing or in-progress criminal activity, that there were "no exigent circumstances or threat to public safety requiring police intervention," and that "Officer Pickrell failed to exercise due diligence when he neglected to review the information in the search result."  [Filing No. 43-2 at 42-45.]  In order for the Indiana Court of Appeals' decision to have a preclusive effect in this case, the interests of the parties in the state court case must have been aligned with the interests of the parties in this case, and the state court case must have resulted in a final judgment (so that the losing party had a full and fair opportunity to litigate the issue).  *See Cannaday v. Sandoval*, 458 Fed. App'x 563, 566 (7th Cir. 2012) (rejecting plaintiff's reliance in § 1983 case on state court's finding in underlying criminal case that evidence should be suppressed because officers did not have probable cause to search home, and noting that "the prosecutors in the criminal proceeding had no interest in the potential civil liability of the police officers"); *Paige v. City of Fort Wayne*, 2010 WL 3522526, at *5 n.9 (N.D. Ind. 2010) (court noting that it must look to Indiana's law of collateral estoppel to determine whether the state court's denial of motion to suppress had a preclusive effect in a § 1983 action, and that Indiana law requires a final judgment for collateral estoppel to apply).  Neither of those conditions are present here:  (1) Defendants were not parties

to Mr. Thorne's criminal case and their interests were not aligned with the interests of the prosecution, *Cannaday*, 458 Fed. App'x at 566; and (2) even if those interests were aligned, the criminal case did not result in a final judgment, *see Paige*, 2010 WL 3522526, at *5 n.9 ("A ruling on a motion to suppress, however, is generally not a final judgment") (citing *Best v. City of Portland*, 554 F.3d 698, 701 (7th Cir. 2008)).  The state court's determination that Officer Pickrell did not have reasonable suspicion to stop Mr. Thorne and search him and his backpack has no preclusive effect in this case.

The existence of the warrant, coupled with Officer Pickrell's knowledge of Mr. Thorne through previous encounters, provided reasonable suspicion for Officer Pickrell to stop Mr. Thorne.[9]  Accordingly, Mr. Thorne's Fourth Amendment claim based on Officer Pickrell's initial stop fails as a matter of law, and the Court **GRANTS** Defendants' Motion for Summary Judgment on that claim.

### ii.    Officer Pickrell's Pursuit and Arrest of Mr. Thorne

The second discrete act the Court will consider is Officer Pickrell's pursuit and arrest of Mr. Thorne.   Mr. Thorne argues that the pursuit and arrest, like the initial stop, were unconstitutional because the warrant upon which Officer Pickrell relies was non-extraditable. Officer Pickrell argues that both the existence of the warrant and the fact that Mr. Thorne fled gave him probable cause to pursue and arrest Mr. Thorne.

"The existence of probable cause to arrest is an absolute defense to any § 1983 claim against a police officer for false arrest."  *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 713-14

---

[9] Because Officer Pickrell had reasonable suspicion to initiate the stop, the Court need not address Defendants' additional argument that Mr. Thorne was never seized – a requirement for a Fourth Amendment claim related to a stop, *Baird v. Renberger*, 576 F.3d 340, 344 (7th Cir. 2009) – since Mr. Thorne immediately fled.

(7th Cir. 2013) (citing *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006)); *see also*

*Rooni v. Biser*, 742 F.3d 737, 740 (7th Cir. 2014).  Accordingly, in order to succeed on a false

arrest claim under § 1983, Mr. Thorne must show that he was arrested without probable cause.

*Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009); *Bugariu v. Town of St. John, Ind.*,

2014 WL 958025, at *3 (N.D. Ind. 2014) ("The big question in a false arrest claim under…federal

law is whether the defendant had probable cause for the arrest").

     "Probable cause to make an arrest exists when a reasonable person confronted with the sum

total of the facts known to the officer at the time of the arrest would conclude that the person

arrested has committed, is committing, or is about to commit a crime." *Venson v. Altamirano*, 749

F.3d 641, 649 (7th Cir. 2014); *see also Huff v. Reichert*, 744 F.3d 999, 1007 (7th Cir. 2014)

("Probable cause exists when the facts and circumstances within [the officer's] knowledge and of

which they have reasonably trustworthy information are sufficient to warrant a prudent person in

believing that the suspect had committed an offense") (quotation and citation omitted); *Gibbs v.

Lomas*, 755 F.3d 529, 537 (7th Cir. 2014) (an officer has probable cause when, "given the totality

of the circumstances, a reasonable officer would believe that the suspect had committed a crime")

(quotation and citation omitted).  Probable cause "is a fluid concept that relies on the common-

sense judgment of the officers based on the totality of the circumstances." *United States v. Reed*,

443 F.3d 600, 603 (7th Cir. 2006).  Courts "step into the shoes of a reasonable person in the position

of the officer, considering the facts known to the officer at the time, [but] do not consider the

subjective motivations of the officer." *Thayer v. Chiczewski*, 705 F.3d 237, 247 (7th Cir. 2012)

(quotations and citations omitted).

     "Generally, a person arrested pursuant to a facially valid warrant cannot prevail in a § 1983

suit for false arrest; this is so even if the arrest warrant is later determined to have an inadequate

factual foundation." *Juriss v. McGowan*, 957 F.2d 345, 350-51 (7th Cir. 1992).  "Critically, the probable cause analysis is an *ex ante* test: 'the fact that the officer later discovers additional evidence unknown to [him] at the time of the arrest is irrelevant as to whether probable cause existed at the crucial time.'"  *Smith v. Ball State Univ.*, 295 F.3d 763, 769-70 (7th Cir. 2002) (quoting *Qian v. Kautz*, 168 F.3d 949, 954 (7th Cir. 1999)).  The fact that the warrant upon which Officer Pickrell relied was later determined to be non-extraditable is of no moment – the focus is on what Officer Pickrell knew at the time of the pursuit and arrest.  The existence of the warrant, and the fact that Officer Pickrell did not know that it was non-extraditable, gave Officer Pickrell probable cause to pursue and arrest[10] Mr. Thorne.  *See Case v. Kitsap Cnty. Sheriff's Dep't*, 249 F.3d 921, 928 (7th Cir. 2001) ("There is a long line of cases from this and other circuits that an 'NCIC hit,' although not definitive in terms of conviction, 'has been routinely accepted in establishing probable cause for a valid arrest'") (quoting *United States v. Hines*, 564 F.2d 925, 927 (10th Cir. 1977)); *United States v. Boyce*, 2011 WL 1085792, at *4 (N.D. Ind. 2011) (officer had probable cause to arrest defendant where database search indicated that he had an outstanding warrant, even where warrant was later determined to be non-extraditable).

Additionally, even if the warrant did not provide probable cause for Officer Pickrell to pursue Mr. Thorne after he fled and to arrest him, the fact that Mr. Thorne fled created separate probable cause for the pursuit and arrest.  Indiana Code § 35-44.1-3-1(a) provides that:

---

[10] It is not clear from the parties' filings nor from the various bodycam videos which individual actually arrested Mr. Thorne.  Only Officer Snyder refers to arresting Mr. Thorne in his Affidavit. [Filing No. 34-8 at 2.]  But the Arrest Summary Report attached as an exhibit to Defendants' opening brief lists Officer Pickrell in the field "Arrested By" for the August 30, 2018 incident. [Filing No. 34-5 at 9.]  For purposes of this motion, and out of an abundance of caution, the Court will consider Officer Pickrell, Lieutenant Munoz, and Officer Snyder to all be arresting officers.

(a)     A person who knowingly or intentionally:

(1) forcibly resists, obstructs, or interferes with a law enforcement officer or a person assisting the officer while the officer is lawfully engaged in the execution of the officer's duties; [or]

\*               \*               \*

(3)  flees from a law enforcement officer after the officer has, by visible or audible means, including operation of the law enforcement officer's siren or emergency lights, identified himself or herself and ordered the person to stop;

commits resisting law enforcement, a Class A misdemeanor.

Under Indiana law, § 35-44.1-3-1 is "construed to require that a law enforcement officer's order to stop be based on reasonable suspicion or probable cause." *Gaddie v. State*, 10 N.E.3d 1249, 1255 (Ind. 2014).

As discussed above, the Court has found that Officer Pickrell had reasonable suspicion to initiate the stop of Mr. Thorne.  As to Mr. Thorne's argument that he fled because he did not know that Officer Pickrell was a police officer and was scared, Mr. Thorne's subjective beliefs during the encounter are irrelevant to the constitutional analysis.  Although "[a] police officer may not ignore conclusively established evidence of the existence of an affirmative defense" to the crime for which they are stopping the defendant, *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1061 (7th Cir. 2004), even if Officer Pickrell thought there was a possibility that Mr. Thorne did not understand that he was a police officer commanding him to stop, this would not change the Court's analysis.  Moreover, the undisputed evidence does not support Mr. Thorne's contention that he did not know Officer Pickrell was a police officer and so decided to flee because he was scared.  Officer Pickrell was in full uniform, and pulled up next to Mr. Thorne in a marked police cruiser.  Mr. Thorne had had numerous previous encounters with FPD officers, and can be heard calling Officer Pickrell "Lance" in Officer Snyder's bodycam video. [Snyder Bodycam 1 at 02:12;

Snyder Bodycam Video at 02:39.]  Officer Pickrell yelled "stop" multiple times to Mr. Thorne when he fled.  Based on the circumstances, the Court finds that a reasonable officer in Officer Pickrell's position could have concluded that Mr. Thorne was resisting law enforcement by fleeing from the initial stop.  This provided Officer Pickrell with additional probable cause to pursue Mr. Thorne after he fled, and to arrest him.  *See Draper v. Reynolds*, 369 F.3d 1270, 1276-77 (11th Cir. 2004) (police officer had "ample probable cause" to arrest individual for resisting law enforcement where he had pulled individual over for taillight violation and individual "repeatedly refus[ed] to comply with [the officer's] reasonable instructions, and…act[ed] belligerently and confrontationally").  Because Officer Pickrell had probable cause to pursue and arrest Mr. Thorne, an unlawful arrest claim based on Officer Pickrell's actions fails, and the Court **GRANTS** Defendants' Motion for Summary Judgment on that claim.

### iii.      Lieutenant Munoz's Pursuit and Arrest of Mr. Thorne

Lieutenant Munoz first encountered Mr. Thorne on August 30, 2018 when Lieutenant Munoz arrived on the scene and observed Officer Pickrell and Mr. Thorne in a physical struggle. [Filing No. 34-4 at 2.]  Lieutenant Munoz had heard over the dispatch radio that Officer Pickrell had discovered an active warrant for Mr. Thorne's arrest, and also that Mr. Thorne was fleeing. [Filing No. 34-4 at 2.]  When he arrived, he observed that there was a physical struggle and that Mr. Thorne was "actively resisting" while Officer Pickrell tried to gain control of Mr. Thorne's hands.  [Filing No. 34-4 at 2.]  The various bodycam videos reflect a chaotic situation, where Mr. Thorne refused to show his hands and officers – including Lieutenant Munoz – commanded Mr. Thorne at least fourteen times to give the officers his hands or put his hands behind his back.

The fact that Lieutenant Munoz heard over the dispatch radio that there was an active warrant for Mr. Thorne's arrest and that Mr. Thorne had fled Officer Pickrell's attempts to stop

him, coupled with Lieutenant Munoz's own observation at the scene that Mr. Thorne was resisting law enforcement, provided probable cause for Lieutenant Munoz to pursue and arrest Mr. Thorne. *See Askew v. City of Chicago*, 440 F.3d 894, 896-97 (7th Cir. 2006) (probable cause existed where information provided in police radio dispatch was confirmed by officer's observations at the scene); *United States v. Young*, 38 F.3d 338, 341 (7th Cir. 1994) ("[police] radio dispatch and the confluence of corroborative facts observed by the arresting officer" supported probable cause finding). "[P]robable cause does not require certainties," *United States v. Sawyer*, 224 F.3d 675, 680 (7th Cir. 2000), and the radio dispatch that there was an outstanding warrant, along with Lieutenant Munoz's own observations when he arrived at the scene, provided Lieutenant Munoz with probable cause to pursue and arrest Mr. Thorne. Lieutenant Munoz's actions do not form the basis of a viable unlawful arrest claim, and Defendants' Motion for Summary Judgment as to that claim is **GRANTED**.

### iv.   Officer Snyder's Pursuit and Arrest of Mr. Thorne

Officer Snyder first heard of Officer Pickrell's encounter with Mr. Thorne on August 30, 2018 when he heard over the dispatch radio that Officer Pickrell was "out of his car with Albert Thorne." [Filing No. 34-8 at 2.] He also learned through dispatch that Officer Pickrell was requesting back-up, and that Officer Pickrell was "in a foot pursuit" of Mr. Thorne. [Filing No. 34-8 at 2.] When Officer Snyder arrived on the scene, he observed Mr. Thorne "actively resisting Officer Pickrell," saw that Mr. Thorne's hands were "tucked underneath him," and saw that Mr. Thorne "refused several commands to release his hands." [Filing No. 34-8 at 2.] Officer Snyder was finally able to get Mr. Thorne's hands behind his back after Lieutenant Munoz sprayed Mr. Thorne with OC spray and after the officers continued telling Mr. Thorne to stop resisting. [Filing No. 34-8 at 2.]

Based on the information that Officer Snyder heard over the dispatch radio and on his own observations when he arrived at the scene, the Court finds that Officer Snyder had probable cause to pursue and arrest Mr. Thorne.  *See Askew*, 440 F.3d at 896-97; *Young*, 38 F.3d at 341.  Mr. Thorne's unlawful arrest claim against Officer Snyder fails as a matter of law, and the Court **GRANTS** Defendants' Motion for Summary Judgment on that claim.

> b.   Whether Officer Pickrell, Lieutenant Munoz, and Officer Snyder Are Entitled to Qualified Immunity

Qualified immunity "protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010).  In determining whether a defendant is entitled to qualified immunity, a court asks "whether the plaintiff's allegations make out a deprivation of a constitutional right, and whether the right was clearly established at the time of defendant's alleged misconduct." *Id.*  The "focus 'is on whether the officer had fair notice that [his] conduct was unlawful.'" *Balsewicz v. Pawlyk*, 963 F.3d 650, 656-67 (7th Cir. 2020) (quoting *Kisela v. Hughes*, --- U.S. ----, 138 S. Ct. 1148, 1152 (2018)).

The Court has already concluded that Officer Pickrell did not violate Mr. Thorne's constitutional rights by stopping him because he had reasonable suspicion to do so, and that Officer Pickrell, Lieutenant Munoz, and Officer Snyder did not violate Mr. Thorne's constitutional rights by pursuing and arresting him, because they had probable cause for all of their actions. Accordingly, because there has been no violation of a constitutional right, the Court need not consider the additional argument that Officer Pickrell, Lieutenant Munoz, and Officer Snyder are entitled to qualified immunity. *Mucha v. Village of Oak Brook*, 650 F.3d 1053, 1057-58 (7th Cir.

2011) (when there is no constitutional violation, defendants "do not require the additional protection of qualified immunity").[11]

In sum, the Court finds that Mr. Thorne's Fourth Amendment claims against Officer Pickrell, Lieutenant Munoz, and Officer Snyder relating to the initial stop and subsequent arrest fail as a matter of law because the officers had probable cause for their actions.  The Court **GRANTS** Defendants' Motion for Summary Judgment on Mr. Thorne's Fourth Amendment unlawful arrest claims.

         2.    *Unlawful Use of Excessive Force*

         a.    <u>Whether Officer Pickrell, Lieutenant Munoz, and Officer Snyder Violated Mr. Thorne's Fourth Amendment Rights By Using Excessive Force Against Him</u>

         i.    **Officer Pickrell's Use of Force**

Defendants argue that Officer Pickrell used reasonable force when he first had physical contact with Mr. Thorne at the end of the chase.  [Filing No. 35 at 19.]  They contend that two things happened to "increase the severity of the situation":  (1) Officer Pickrell lost control of his taser, which meant that Mr. Thorne could have gained control of the taser and used it against Officer Pickrell; and (2) Mr. Thorne momentarily put Officer Pickrell in a headlock.  [Filing No. 35 at 19-20.]  Defendants assert that even though a headlock is considered deadly force, Officer Pickrell did not escalate his own use of force but instead continued to try to gain physical control of Mr. Thorne.  [Filing No. 35 at 20.]  They note that Officer Pickrell held Mr. Thorne until backup

---

[11] The Court notes that, even if there had been a constitutional violation, it is not aware of any legal authority to support the notion that it is clearly established that an officer cannot pursue and arrest a suspect where there is an outstanding warrant, if the warrant is later discovered to be non-extraditable.  To the contrary, caselaw indicates that a warrant provides the officer with probable cause even if it later is determined to be invalid.  Further, is it not clearly established that an officer cannot pursue a suspect who is fleeing law enforcement and resisting arrest under those circumstances.

arrived, rather than placing him in a chokehold, punching him in the face, or striking him with a baton. [Filing No. 35 at 20.] Defendants contend that the only recorded injuries to Mr. Thorne from Officer Pickrell's actions were abrasions to Mr. Thorne's knees and a small laceration on the bottom of his foot from continuing to run after his shoe fell off. [Filing No. 35 at 20.] They argue that there is no evidence of more serious injuries such as visible bruises, broken bones, serious cuts requiring sutures, or a medical condition requiring hospital admission, and that Mr. Thorne refused treatment in the emergency room. [Filing No. 35 at 20.]

In response, Mr. Thorne argues that he was not fleeing, and that it is illegal to use force to arrest someone if there is no probable cause or reasonable suspicion for the arrest. [Filing No. 44 at 20.] He argues that Officer Pickrell "used knee strikes to [Mr.] Thorne's mid section not the other way around." [Filing No. 44 at 20.] Mr. Thorne reiterates many of the arguments he set forth in connection with his unlawful arrest claims related to a lack of probable cause. [Filing No. 44 at 22-23.] He states that Officer Pickrell used excessive force in tackling him, and that he did not square up on Officer Pickrell, put Officer Pickrell in a headlock, or otherwise threaten Officer Pickrell. [Filing No. 44 at 23.] Mr. Thorne argues that the emergency room staff did not check his sides for pain, bruises, scrapes, or swelling, and that he did not want treatment because he did not want to be stuck with a bill and because he "could not open his eyes to see who was trying to examine him and touch his injuries and did not trust anyone around him due to the traumatizing experience he had just encountered." [Filing No. 44 at 23-24.] Mr. Thorne notes that he was in pain for three weeks after the incident. [Filing No. 44 at 24.]

In their reply, Defendants argue that Mr. Thorne admits that he used physical force to "defend" himself against Officer Pickrell, and that he had control of Officer Pickrell's taser at one

point.  [Filing No. 45 at 8.]  They contend that Mr. Thorne does not dispute that Officer Pickrell was injured during the struggle, or that Mr. Thorne resisted arrest.  [Filing No. 45 at 8.]

Whether a particular use of force has crossed the line into excessive force is governed by the Fourth Amendment's protection against unreasonable seizures.  *Weinmann v. McClone*, 787 F.3d 444, 448 (7th Cir. 2015).  The reasonableness standard is objective and each use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).  This standard "is fact-intensive, asking whether each use of force was reasonable under the totality of the circumstances, 'including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Turner v. City of Champaign*, 979 F.3d 563, 567 (7th Cir. 2020) (quoting *Graham*, 490 U.S. at 396)).  Additionally, "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving" – about the amount of force that is necessary in a particular situation.  *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (citing *Graham*, 490 U.S. at 396-97).  The reasonableness of a use of force is a question of law for the Court to decide.  *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003) ("Since *Graham* we have regularly treated the reasonableness of force as a legal issue").

Here, Officer Pickrell had reasonable suspicion to stop Mr. Thorne – there was a warrant for his arrest, and Officer Pickrell did not know at that time that the warrant was non-extraditable. Officer Pickrell was in full uniform, driving a marked police cruiser, and asked Mr. Thorne to talk to him.  When Mr. Thorne fled, Officer Pickrell ordered him to stop multiple times and threatened to tase him.  When Officer Pickrell caught up to Mr. Thorne, he held him on the ground until

backup arrived.  Mr. Thorne contends that Officer Pickrell delivered "knee blows" to his body and admits that he fought to "defend" himself, and that he briefly had possession of Officer Pickrell's taser.  Yet Officer Pickrell did not place Mr. Thorne in a chokehold, or use other aggressive methods of restraint – he simply tried to hold him down until other officers arrived.  The Court finds that this type of force, under the circumstances Officer Pickrell confronted, was not excessive.  *See Cherry v. Washington Cnty., Wis.*, 526 Fed. App'x 683, 687 (7th Cir. 2013) (officer did not use excessive force by pushing suspect to the ground and pressing his face against the road during arrest, when suspect had disobeyed officers' instructions to look straight ahead and not turn around); *Smith v. City of Chicago*, 242 F.3d 737, 744 (7th Cir. 2001) (holding officers did not use excessive force when they pulled fleeing suspect out of his car, pinned his arms behind his back, slammed him against the hood of his car, and handcuffed him); *Radjen v. Parrish*, 2009 WL 3060206, at *9 (N.D. Ind. 2009) (no excessive force used when officer threw suspect against trunk of patrol car because reasonable officer would have thought suspect was continuing to struggle and that officer needed to gain physical control over suspect).

Further, Officer Pickrell's efforts resulted in only minor injuries to Mr. Thorne, including small abrasions on his knees and an abrasion on the bottom of his foot.  Mr. Thorne refused treatment for those injuries.  And while Mr. Thorne argues that emergency room personnel did not check him for injuries to his side, the medical records and Officer Snyder's bodycam video do not reflect that Mr. Thorne complained of any such injuries.  This is telling, given that Mr. Thorne repeatedly complained of pain in his foot, knees, and eyes.  There simply is no evidence that

Officer Pickrell used excessive force against Mr. Thorne.[12]  Defendants' Motion for Summary Judgment on Mr. Thorne's excessive force claim against Officer Pickrell is **GRANTED**.

### ii.  Lieutenant Munoz's Use of Force

In support of their Motion for Summary Judgment, Defendants argue that Lieutenant Munoz's two closed-fist strikes to Mr. Thorne's torso and spraying Mr. Thorne with OC spray did not constitute excessive force because Mr. Thorne was actively resisting arrest.  [Filing No. 35 at 21.] Defendants note that it is undisputed that Mr. Thorne was actively resisting at the time, that Mr. Thorne refused to comply with commands to remove his hands from underneath him, and that the use of force ceased as soon as his hands were under control.  [Filing No. 35 at 21.] Defendants also contend that it is significant that after the OC spray was deployed, the officers gave Mr. Thorne water to rinse his eyes, paramedics were called, and Mr. Thorne was taken to the emergency room.  [Filing No. 35 at 21.]  They note, however, that Mr. Thorne refused treatment in the emergency department and did not complain of any issues with his vision.  [Filing No. 35 at 21.]  They assert that "[t]here is no documented pain or injury from the two strikes to the midsection delivered by Lt. Munoz."  [Filing No. 35 at 22.]

In response, Mr. Thorne argues that he was curled in a fetal position to protect himself and was not resisting arrest, and again argues that there was no probable cause for his arrest.  [Filing No. 44 at 20.]  He contends that he has suffered "extreme burning in his eyes from the OC spray," and that Lieutenant Munoz "didn't just squirt/use a short burst shot of spray to [his] face, he held the nozzle down multiple times heavily spraying [Mr.] Thorne in the eyes and face excessively

---

[12] Mr. Thorne argues that he did not square up on Officer Pickrell or put him in a headlock. The Court cannot discern from Officer Pickrell's bodycam video whether Mr. Thorne placed Officer Pickrell in a headlock because the video is dark and the body camera only captures Mr. Thorne's body pressed up against Officer Pickrell's body.  In any event, the Court finds that the force used by Officer Pickrell was justified even if Mr. Thorne did not have Officer Pickrell in a headlock.

while Mr. Thorne was already on the ground." [Filing No. 44 at 21-25.] Mr. Thorne argues that

he was not reaching for anything in his waistband or pockets, but was trying to use his shirt to

wipe his eyes. [Filing No. 44 at 25.] He contends that he "hurt from head to toe sustaining many

different injuries." [Filing No. 44 at 25.]

In their reply, Defendants argue that Mr. Thorne does not dispute that he resisted arrest,

and that the use of OC spray and administering strikes to Mr. Thorne's torso were reasonable under

the circumstances. [Filing No. 45 at 8-9.]

When Lieutenant Munoz arrived at the scene, it was chaotic and he immediately observed

that Office Pickrell was trying to gain control of Mr. Thorne and that Mr. Thorne's hands were

underneath him. Lieutenant Munoz and the other officers commanded Mr. Thorne at least fourteen

times to show his hands or put his hands behind his back – Mr. Thorne refused. At that point,

fearing that Mr. Thorne was concealing a weapon, Lieutenant Munoz deployed the OC spray.

When the OC spray did not immediately cause Mr. Thorne to comply with the commands to show

his hands, Lieutenant Munoz believed that Mr. Thorne was reaching for something in his

waistband and administered two closed first strikes to Mr. Thorne's torso. Once the officers

secured Mr. Thorne's hands and handcuffed him, all use of force stopped and the officers

immediately offered Mr. Thorne water to rinse his eyes. Again, whether or not Mr. Thorne was

actually reaching in his waistband for a weapon, or whether he even had a weapon, is irrelevant.

The focus is on what Lieutenant Munoz reasonably perceived the situation to be. *See Graham,*

490 U.S. at 396.

Under the circumstances, the Court finds that Lieutenant Munoz's use of force was

reasonable. *See Brooks v. City of Aurora*, 653 F.3d 478, 486-87 (7th Cir. 2011) (officers did not

use excessive force when they pepper sprayed suspect who was backpedaling and attempting to

knock away officers' hands during arrest); *Duran v. Sirgedas*, 240 Fed. App'x 104, 118 (7th Cir. 2007) (officer did not use excessive force where suspect fled to avoid arrest and then struggled with officers and officer struck suspect in leg with baton and punched him in the head with a closed fist); *Davis v. Frantz*, 1999 WL 370047, at *3 (7th Cir. 1999) (officer did not use excessive force when he sprayed suspect with mace while suspect was actively resisting arrest); *Williams v. Hall*, 2021 WL 4125247, at *3 (N.D. Ind. 2021) (officer who punched suspect in the face and administered "hammer strikes" used reasonable force where suspect "was actively fighting the officers' attempts to arrest him"). The bodycam videos show Mr. Thorne resisting arrest, ignoring repeated commands to show his hands or put his hands behind his back, and struggling with officers. They also show that Lieutenant Munoz deployed the OC spray and struck Mr. Thorne twice in the torso as part of the officers' efforts to gain control of Mr. Thorne's hands, and that all physical contact stopped once Mr. Thorne was handcuffed. Mr. Thorne has not presented any evidence that Lieutenant Munoz used excessive force against him. The Court **GRANTS** Defendants' Motion for Summary Judgment on Mr. Thorne's excessive force claim against Lieutenant Munoz.

### iii.     Officer Snyder's Use of Force

Defendants argue in support of their Motion for Summary Judgment that Officer Snyder's use of force was limited to controlling Mr. Thorne's arm and placing him in handcuffs. [Filing No. 35 at 22.] They contend that "[t]his basic restraint – common to most arrests – is patently reasonable and cannot serve as the basis for an excessive force claim." [Filing No. 35 at 22.]

Mr. Thorne does not discuss Officer Snyder's use of force in his response brief, [*see* Filing No. 44], and Defendants note in their reply that Mr. Thorne "makes no claim that Officer Snyder subjected him to excessive force," [Filing No. 45 at 8].

Mr. Thorne did not respond to Defendants' arguments regarding Officer Snyder's use of force, and has therefore waived any opposition to those arguments. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument…results in waiver"); *Laborers' Inter. Union of North America v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (holding that arguments not presented in response to motion for summary judgment are waived); *De v. City of Chicago*, 912 F. Supp. 2d 709, 734 (N.D. Ill. 2012) ("Failure to set forth any evidence or to develop any arguments in opposition to the moving party's summary judgment motion results in waiver of the nonmoving party's arguments and an abandonment of his claims").  Consequently, the Court **GRANTS** Defendants' Motion for Summary Judgment on Mr. Thorne's claim that Officer Snyder used excessive force against him in violation of the Fourth Amendment.

>    b.    Whether Officer Pickrell, Lieutenant Munoz, and Officer Snyder
>          Are Entitled to Qualified Immunity

As with Mr. Thorne's unlawful arrest claim, because the Court has found that Officer Pickrell, Lieutenant Munoz, and Officer Snyder did not violate Mr. Thorne's constitutional rights by using excessive force, it need not decide whether those individuals are also entitled to qualified immunity.  The Court notes, however, that when faced with a qualified immunity defense in the excessive force context, the plaintiff "has the burden of either identifying a 'closely analogous case that established a right to be free from the type of force the police officers used on him' or of showing 'that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment.'"  *Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015) (quoting *Findlay v. Lenderman*, 722 F.3d 895, 899 (7th Cir. 2013)).  Mr. Thorne has not done so and, indeed, clearly established law dictates that the force used against Mr. Thorne was reasonable and was not excessive.

3.      *Unlawful Search Claims*

Defendants argue in support of their Motion for Summary Judgment that because Mr. Thorne's arrest was lawful, the searches of his person and his backpack were lawful as well.  [Filing No. 35 at 22.]  They argue that "it is well-settled that police are permitted to search an arrestee, and items within his immediate area of control, incident to a lawful arrest."  [Filing No. 35 at 22-23.]

In response, Mr. Thorne argues that  the searches were products of an unlawful arrest, because Defendants lacked reasonable suspicion to conduct a *Terry* stop and lacked probable cause to arrest him.  [Filing No. 44 at 26.]  He notes that he "verbally, loud and clear, told the defendants he did not give consent to search his backpack and yet they continued to search Mr. Thorne and his backpack against his will and without his consent."  [Filing No. 44 at 26.]

In their reply, Defendants argue that Mr. Thorne's only challenge to the searches is that the underlying arrest was invalid, and reiterate their arguments that the arrest was constitutionally valid.  [Filing No. 45 at 9.]

After an individual is arrested, "it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape…[and] to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction."  *Chimel v. California*, 395 U.S. 752, 762-63 (1969). Additionally, although an officer's authority to search an individual incident to arrest comes from the "need to disarm and to discover evidence," "[a] custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification."  *United States v. Robinson*, 414 U.S.

218, 235 (1973). In short, where there is a lawful arrest, a "full search of the person" is justified.
*Id.*

As discussed above, Mr. Thorne's arrest was based on probable cause and was lawful. Further, the Indiana Court of Appeals' decision to suppress evidence obtained during the search of Mr. Thorne and his backpack has no preclusive effect in this litigation and is not otherwise binding on this Court. The searches of Mr. Thorne and his backpack were incident to his lawful arrest, his unlawful search claims fail as a matter of law, and the Court **GRANTS** Defendants' Motion for Summary Judgment on those claims.

### 4.   *Malicious Prosecution Claims*

Defendants argue in support of their Motion for Summary Judgment that Mr. Thorne's malicious prosecution claims are properly brought under the Fourteenth Amendment or Indiana state law, and that they fail as a matter of law because Defendants had probable cause to arrest him. [Filing No. 35 at 27-28.] Defendants argue further that in order to prevail on a malicious prosecution claim, Mr. Thorne's underlying prosecution must have terminated in his favor, but the charges against Mr. Thorne were dismissed which does not satisfy this requirement. [Filing No. 35 at 28.]

Mr. Thorne argues that he was maliciously prosecuted because Officer Pickrell fabricated evidence when he falsely stated "in his affidavits" that Mr. Thorne "squared up on him with closed fists" and that Mr. Thorne "put him in a head lock which ultimately had Mr. Thorne charged with Battery on a public safety officer." [Filing No. 44 at 26-27.] Mr. Thorne contends that there was no probable cause to arrest him, and that the dismissal of the charges against him satisfies the requirement that the underlying prosecution terminated in his favor. [Filing No. 44 at 27.]

Defendants reiterate their arguments in their reply brief. [Filing No. 45 at 10-11.]

The Court notes at the outset that the Seventh Circuit Court of Appeals has explained that there is no federal claim for "malicious prosecution," but rather such a claim is more properly characterized as one for wrongful pretrial detention. *Manuel v. City of Joliet, Ill.*, 903 F.3d 667, 670 (7th Cir. 2018) (holding that there is no constitutional right not to be prosecuted without probable cause, but "there is a constitutional right not to be held in custody without probable cause") (emphasis omitted).  Further, a wrongful pretrial detention claim sounds in the Fourth Amendment, not the Fourteenth Amendment. *Lewis v. City of Chicago*, 914 F.3d 472, 479 (7th Cir. 2019) ("all § 1983 claims for wrongful pretrial detention – whether based on fabricated evidence or some other defect – sound in the Fourth Amendment").

In connection with his "malicious prosecution" claims, which the Court characterizes as Fourth Amendment wrongful pretrial detention claims based on the Seventh Circuit's instruction, Mr. Thorne alleges that Officer Pickrell filed a probable cause affidavit which contained "false testimony, false statements, and untruths," that Lieutenant Munoz and Officer Snyder knew to be false.  [Filing No. 1 at 18.]  Mr. Thorne goes on to explain that Defendants should have known that the warrant was non-extraditable, did not confirm the nature of the warrant with dispatch, and knew there was no probable cause to stop and arrest him.  [Filing No. 1 at 18-19.]  Mr. Thorne's allegations indicate that his claims are based on "the right not to be held in custody without probable cause." *Lewis*, 914 F.3d at 479.  However, the Court has already found that the Defendants had probable cause to stop and arrest Mr. Thorne.  Moreover, Mr. Thorne's allegation that Officer Pickrell included false statements in the probable cause affidavit appear to be based on statements by Officer Pickrell that there was an outstanding warrant for Mr. Thorne's arrest. This was not a false statement and, as the Court has discussed above, the fact that the warrant ultimately was found to be non-extraditable is irrelevant to the constitutional analysis.  Mr.

Thorne's "malicious prosecution" claims, properly characterized as unlawful pretrial detention claims brought under the Fourth Amendment, are predicated on a lack of probable cause and, consequently, fail as a matter of law.[13]   The Court **GRANTS** Defendants' Motion for Summary Judgment on Mr. Thorne's malicious prosecution/unlawful pretrial detention claims.

### B.        Federal Claims Against the FPD and the City

Mr. Thorne sets forth claims for "violation of statutory rights," "violation of statutory civil rights," and "respondeat superior liability" against the FPD and the City.  [Filing No. 1 at 14-16; Filing No. 1 at 21.]

Defendants argue in support of their Motion for Summary Judgment that the FPD lacks the capacity to be sued, because it is not a separate municipal entity from the City.  [Filing No. 35 at 23.]  They assert that a municipal entity cannot be held liable when there is no underlying constitutional violation by an individual officer, and that even if there was an underlying constitutional violation, Mr. Thorne has not produced any evidence that a City policy led to a constitutional deprivation.  [Filing No. 35 at 23.]  Defendants contend that Mr. Thorne has not alleged any true policy of the City's that caused an alleged constitutional deprivation, and also has not shown any deliberate indifference to training which would support a claim under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  [Filing No. 35 at 23-24.]

In his response, Mr. Thorne does not address Defendants' arguments regarding the FPD's or the City's liability, [*see* Filing No. 44], and Defendants note this failure in their reply, [Filing No. 45 at 9].

---

[13] To the extent Mr. Thorne intended to assert malicious prosecution claims under Indiana law, those claims would fail for the same reasons, discussed below, that his other state law claims fail.

As discussed above in connection with Mr. Thorne's excessive force claim against Officer Snyder, Mr. Thorne has waived any argument that his claims against the FPD and the City fail. *See Bonte*, 624 F.3d at 466; *Laborers' Inter. Union of North America*, 197 F.3d at 1197; *De*, 912 F. Supp. 2d at 734.   In any event, his claims fail as a matter of law.   First, the FPD is not a separate legal entity from the City and, accordingly, is not a proper defendant.   *House v. Anderson Police Dept.*, 2021 WL 2351056, at *1 (S.D. Ind. 2021) ("Under Indiana law, a municipal police department is neither established as a separate legal entity nor granted the capacity to sue or be sued").   Second, "[t]ime and again the Supreme Court has reinforced the strict prohibition against allowing principles of vicarious liability to establish municipal liability under § 1983." *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 377 (7th Cir. 2020).   Rather, "[a] municipality may be sued only for constitutional violations that it caused through one of its policies or by someone with final policymaking authority." *Andersen v. Village of Glenview*, 821 Fed. App'x 625, 628 (7th Cir. 2020).   Mr. Thorne has not even alleged – let alone produced evidence of – an "official policy, or an established custom, or a decision by a final decision maker" that caused Mr. Thorne's constitutional rights to be violated.   *Quinn v. Wexford Health Sources, Inc.,* 8 F.4th 557, 568 (7th Cir. 2021).   The Court **GRANTS** Defendants' Motion for Summary Judgment on Mr. Thorne's federal claims against the FPD and the City.

### C.   State Law Claims

Because the Court has granted Defendants' Motion for Summary Judgment on all of Mr. Thorne's federal claims, it must determine whether it will exercise jurisdiction over his state law claims.   A district court ultimately has discretion whether to exercise supplemental jurisdiction over a plaintiff's state law claims.   *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a

claim…if…the district court has dismissed all claims over which it has original jurisdiction…").

When deciding whether to exercise supplemental jurisdiction, "a federal court should consider and

weigh in each case, and at every stage of the litigation, the values of judicial economy,

convenience, fairness, and comity." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173

(1997) (quotations and citations omitted).

The Court finds that the balance of factors weighs in favor of exercising supplemental

jurisdiction over the remaining state law claim.  First, as to judicial economy, the parties have

already engaged in discovery on the state law claims.  Second, as far as convenience, witnesses

and evidence related to the state law claims are likely located in Frankfort, Indiana where the

appropriate state court to adjudicate those claims is located, but Frankfort is under an hour from

Indianapolis, where this Court is located, making this factor a wash.  And third and fourth, the

Court is perfectly capable of applying Indiana law, and does not find that either party would be

prejudiced by it doing so, making those factors weigh in favor of this Court exercising

supplemental jurisdiction over the state law claims.

In support of their Motion for Summary Judgment, Defendants argue that all of Mr.

Thorne's state law claims fail because he did not serve the City with the pre-suit notice required

by the Indiana Tort Claims Act ("ITCA").  [Filing No. 35 at 29.]  Specifically, Defendants note

that the ITCA bars claims against a political subdivision unless a plaintiff has filed a notice of the

claim with the entity's governing body within 180 days of the loss, and that Mr. Thorne did not do

so and has not done so to date.  [Filing No. 35 at 29.]  Defendants then set forth additional reasons

why each of Mr. Thorne's state law claims fails, including that: (1) Defendants are entitled to

immunity under the ITCA because Mr. Thorne alleges that they acted within the scope of their

employment; (2) the assault and battery claims fails because the amount of force used was

40

reasonable; (3) the false arrest/illegal search/false imprisonment/invasion of privacy claims fail because the Defendants acted with probable cause; and (4) the emotional distress claims fail because the conduct at issue does not support those claims.  [Filing No. 35 at 30-32.]

In his response, Mr. Thorne argues only that Defendants are not entitled to immunity under the ITCA for his state law claims.  [Filing No. 44 at 28.]  He asserts that he meant to allege that Defendants acted outside the scope of their employment.  [Filing No. 44 at 28.]

Defendants reiterate their arguments in their reply.  [Filing No. 45 at 11-12.]

Indiana Code § 34-13-3-8(a) provides that "a claim against a political subdivision is barred unless notice is filed with…the governing body of that political subdivision…within one hundred eighty (180) days after the loss occurs."  A Tort Claim Notice is required under § 34-13-3-8(a) when the plaintiff alleges a state law tort claim against a governmental authority in his individual capacity if the act or omission causing the plaintiff's loss is within the scope of the defendant's employment.  *Bienz v. Bloom*, 674 N.E.2d 998, 1004 (Ind. Ct. App. 1996).  It is undisputed that Mr. Thorne did not file a notice within 180 days of the August 30, 2018 incident and, consequently, his state law tort claims fail.

Further, even if Mr. Thorne had filed a Tort Claim Notice, the ITCA provides that "[a] governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from…[t]he adoption and enforcement of or failure to adopt or enforce…a law…unless the act of enforcement constitutes false arrest or false imprisonment."  Ind. Code § 34-13-3-3(8)(A).  To determine whether a claim is barred by law enforcement immunity, courts must look to the conduct forming the foundation of the claim, rather than relying on the legal theory upon which the claim is based.  *See Bowens v. City of Indianapolis*, 2014 WL 4680662, at *7 (S.D. Ind. 2014).  If the conduct forming the basis of the claim is conduct that would not

41

otherwise be immunized – *e.g.*, the use of excessive force – then the ITCA does not provide immunity.  Mr. Thorne alleges that Officer Pickrell, Lieutenant Munoz, and Officer Snyder were acting within the scope of their employment.  [*See, e.g.*, Filing No. 1 at 12 (alleging that Defendants "act[ed] inside the course and scope of their employment as city police officers for the [FPD]").] Accordingly, they are entitled to immunity under Ind. Code § 34-13-3-3(8)(A) in connection with Mr. Thorne's state law claims, unless their conduct falls within one of the exceptions to law enforcement immunity by constituting excessive force or false arrest.  The acts Mr. Thorne complains of did not constitute false arrest or any other conduct that would not be immunized, as discussed above, so no exception applies.  Indeed, the Court has already found that Defendants' conduct did not violate Mr. Thorne's constitutional rights in any way.  Additionally, to the extent that Mr. Thorne asserts his state law claims against the City, it is immune under the ITCA because the loss for which Mr. Thorne seeks redress resulted from "the adoption and enforcement of or failure to adopt or enforce…a law." *Id.*

Mr. Thorne's state law claims fail because he did not file a Tort Claim Notice and, even if he had, Defendants are entitled to immunity under the ITCA for his state law claims.  The Court **GRANTS** Defendants' Motion for Summary Judgment on Mr. Thorne's state law claims.

### IV.
### CONCLUSION

Because there was reasonable suspicion to stop Mr. Thorne, probable cause to arrest him, and the officers did not use unreasonable force, Mr. Thorne's federal claims fail as a matter of law. Further, his state law claims fail because he did not file a Tort Claim Notice and because Defendants are entitled to immunity under the ITCA in any event.  For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment, [34], on all of Mr. Thorne's claims. Final judgment shall enter accordingly.

Date: 10/14/2021

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**

**Distribution via United States Mail to:**

Albert Thomas Thorne, III
119579
Pendleton – Correctional Industrial Facility
Inmate Mail/Parcels
5124 West Reformatory Road
Pendleton, IN 46064